Next item, No. 182118, Portland Pipe Line Corp. v. City of So. Portland Next item, No. 182118, Portland Pipe Line Corp. v. City of So. Portland May a city enact an embargo on the transportation of crude oil through a harbor and 200 miles of a cross-border presidentially permitted pipeline because it believes that the transportation of oil from Canada is dangerous? May a city enact an embargo on the transportation of crude oil through a harbor and 200 miles of a cross-border presidentially permitted pipeline because it believes that the transportation of oil from Canada is dangerous? As one of the city councilors said, I guess that takes care of tar sands because if you can't transport it here, you can't load it onto ships. But the regulation that passed by the City of Portland deals only with the area within the City of Portland. Am I correct or am I wrong? The language of the ordinance forbids the loading of a ship with crude oil. That means it forbids the unloading of the pipeline. The pipeline, as a physical fact, extends from the harbor to Montreal. If you can't unload at the end of the pipeline, you affect the entire pipeline. The pipeline also extends into portions of the United States. Isn't that correct? It runs from Montreal through three states to the harbor. The ordinance is still facially neutral. Well, the ordinance forbids the unloading of the pipeline to load ships in the harbor. It does not forbid the transportation of oil into Canada. So it's asymmetrical. It only applies to crude oil, not retail oil. So it's not to disturb any activity that exists in the city except to stop the reversal of the flow of the oil through the pipeline. And I think that's not disputed, that the purpose of this ordinance is to stop the reversal of the pipeline, to prevent it from transporting oil from Canada. So the first question is whether this purpose to stop the flow, to regulate the operation of the pipeline... It requires the DOT to engage in a risk assessment analysis to establish safety standards. And this doesn't touch, except incidentally, safety standards, does it? Well, it's the other way around, Your Honor. It regulates pipeline operations, and it does so because it deems the transportation of diluted bitumen, oil from Canada, a dangerous article. And the trial court said that was fine. The Pipeline Safety Act regulations enacted by the DOT, which enacts every one of its standards based on the safety analysis, allows the transportation of oil through the pipeline in both directions, and has specifically looked at whether diluted bitumen needs any additional regulation and said no. Violating Judge Thompson's statement, the two cases, one from the Fourth Circuit and the Fifth Circuit, according to the statute itself, specifically says that the PSA expressly preempts state and local law in the field of safety. Yes, the language of the statute, the Pipeline Safety Act itself, says that the locality shall not adopt safety standards. So the question is, and then there's been a host of cases that says that means the entire field of safety for pipelines is preempted. And there's a host of cases that say that. So then the question is, what is the substantial, real, and logical effect of the ordinance on the DOT's risk assessment safety analysis? Because the Pipeline Safety Act also sets out how the DOT engages in this safety analysis to establish its standards. And the intervention and the interference in that risk analysis process is graphically demonstrated by what happened here and what the trial court said was perfectly appropriate under the Pipeline Safety Act. While the DOT found that diluted bitumen didn't need any additional regulation, the trial court said the city of South Portland could disagree. It could deem, quote, tar sands, a, quote, dangerous article, and could enact an ordinance to, quote, alleviate the risks of transporting it. That is a direct contradiction of what the Pipeline Safety Act preemption provision allows. But the act also limits the Secretary of Transportation's authority to prescribe the location or routing of a pipeline facility. That is correct. But why isn't this a situation where your client is perfectly free to convince some city in Maine to allow this facility to be set up there? This is a pipeline that is located between the city and Montreal since 1941 that cost hundreds of millions of dollars to locate it there. And it can't be moved. It needs to be in this deep harbor for oil tankers. And the citing exception to the DOT's authority relates to the initial geographical locating of a pipeline. It doesn't have anything to do with the regulation of an existing presidentially permitted. Is there a regulation saying that that particular exception only applies to the initial? To my end, I don't believe there's any law that addresses this specific question or any regulation. I also don't believe that there's any other case where there has been an attempt to target pipeline operations and affect only pipeline operations so that the regulation of the locality is directed to the operation. Doesn't this rerouting process also require substantial new infrastructure for this area? Not necessarily, no. The ordinance itself bars the loading of ships irrespective of whether there's any new infrastructure, irrespective of whether there's a molecule of air particulates emitted. It similarly isn't an air regulation. And conversely, there can be new uses which emit more air particulates and which are more unsightly. This isn't a height standard. This isn't an air regulation. If this were, if this were an even-handed, generally applicable air regulation, height standard, noise rule that generally applied so that the impact on the pipeline was only incidental, we wouldn't be here today. That's allowed. What's not allowed is a regulation by a local ordinance that targets the operation of a presidentially-permitted cross-border pipeline that is preempted by the Pipeline Safety Act, and it also violates the one-voice principles that are embodied in the Foreign Commerce Clause provisions when, as here, we have actions in foreign commerce and we have nationally-uniform regulation needed. If we look at the test that's applied for, under the one-voice doctrine, we have five different reasons why the test is met and the foreign affairs doctrine is implicated. We have a subject of national security and foreign policy interest, the import and export of crude oil, and pipelines, which the government has called essential to the national economy. We have extraterritorial impact, which reflects upon the need for nationally-uniform treatment. We have presidential permits that show how the foreign interest has been calibrated and how the local ordinance interferes with those decisions to encourage the flow of crude oil from Canada. How is there a clear conflict with expressed foreign policy? Well, the question of the test is whether it rises to a threshold level that has an impact on foreign policy decision-making, and especially if you look at this in the aggregate, it rejects the lifting of the domestic oil embargo by the federal authorities, a direct conflict, and it also cripples national transportation, maritime, and pipeline across the nation. So that's the aggregate impact, and for all these reasons, as well as the asymmetrical impact, it violates that doctrine. Thank you. Well, that makes two of us. Good afternoon. Jonathan Ettinger for Defendants at Police, the City of South Portland, and its Code Enforcement Officer, Matthew Liconti. The overarching issue here is a little bit different from what Ms. Conner has just explained. The overarching issue is whether the City of South Portland was legally entitled to use its core police powers to enact a zoning ordinance that prohibits a new use that it found would harm the health of its residents and interfere with the city's redevelopment proposals, excuse me, goals and proposals. Despite Portland Pipeline's protestations, the ordinance does not shut down this pipeline. That is simply not true. What it does is it prohibits the bulk loading of crude oil onto ships and prohibits the construction of structures associated with that land use, all out of concerns for the health and welfare of the city and its residents. Now, the district court found after a trial, and appellants have not challenged, the city had sincere concerns about a project to bulk load crude oil. That loading would be a new use. There's a significant difference between unloading and loading. When you unload oil in the port from a ship to the pipeline, you don't have to have the air emission protections that you need when you're loading oil onto a ship because the ship has vapors in the hold of that ship. And as the oil is pumped in, the oil rises in the hold of the ship, and those vapors have to be displaced and they have to be treated. And what Portland Pipeline proposed was two 70-foot tall smokestacks right on the harbor, on a pier, blocking views from neighbors. And whether or not their project in the future may or may not contain such structures, whatever they happen to do, no one knows what they would do in the future. But this was what concerned the city. And the city was concerned, and the judge found this, that those vapors are carcinogenic and otherwise hazardous, and that would certainly increase the risk of hospital admissions, emergency room visits, increased risk of developing cancer, and the risk would be particularly acute for the city's vulnerable residents, children and the elderly. Now, the city was concerned about the health effects, and they were concerned about the redevelopment opportunities. The judge made findings about the proposals that had been for hotels and marina and other redevelopment on the waterfront that is currently and historically been used for industrial purposes, kind of like the seaport here. They were looking at ways to revitalize and rebuild the waterfront. Now, the judge found that this proposal would interfere with it. That's what the city council was faced with when they passed this ordinance. And the judge found that the public comments in official legislative history demonstrate that air quality, aesthetics, and waterfront redevelopment goals pervaded the public and official considerations, and that the ordinance was enacted not because of any animus towards Canada and not to protect businesses in South Portland. No statute, regulation, treaty, executive order, or constitutional provision says the city council's police powers may not be used in that manner. In fact, to the extent any such documents exist, they make plain that neither Congress nor the executive branch intended to displace such police powers. Now, the Pipeline Safety Act, for example, which you were just talking about with Ms. Connors, it does not preempt this ordinance. As Judge Thompson pointed out, this doesn't say anything about safety. This is a zoning ordinance to prohibit the bulk loading of crude oil in a specific area of the city. That's what zoning does. It regulates uses in particular areas of cities and towns. Congress certainly knows how to exempt transmission lines, et cetera, from municipal zoning because it has explicitly done so for nuclear power, for LNG terminals, certain electric transmission lines, and even railroads. All of those statutes that regulate those say you can't have local zoning. Congress made a determination. It was too difficult to cite nuclear power plans because nobody wants them, and who can blame them? But Congress made a determination they were important, so Congress preempted zoning. They didn't do that here. Now, the Pipeline Safety Act itself, before I even get to the Savings Clause, it doesn't even apply to the facilities that Portland Pipeline was proposing to build on the pier. To transport, to bulk load the crude oil from its pipeline to ships. The definitions, the ordinance regulates pipelines and pipelines facilities. The definitions expressly exclude facilities located on the grounds of a materials transportation terminal that are used exclusively to transfer crude, I'm putting in the words crude oil, between non-pipeline modes of transportation or between a non-pipeline mode and a pipeline. Now, think about that. Between two non-pipeline modes of transportation, trucks, oil trucks, one to the other, not covered. Between a non-pipeline mode and a pipeline. That's exactly what they proposed to do, is to transfer oil from a pipeline to a non-pipeline mode, a ship. Those facilities that were prohibited, the construction of which was prohibited by this ordinance, are not even within the definition. And in the reply brief, Portland Pipeline suggests it also regulate, the Pipeline Safety Act also regulates liquids in transportation, hazardous liquids in transportation, oil while it's being transported. If that's the case, it regulates ships too. That's not what it regulates. Congress drew the line and said when it comes out of your pipeline and you're transferring it someplace else, we're not going to regulate it. So that's one reason it doesn't apply. The second reason is there's an express preemption provision. Congress can't, the city can't enact a safety standard, but as Judge Thompson pointed out earlier, it is allowed to zone with respect to the location of a facility. That makes clear that Congress intended the city could do exactly what it's doing. Now the field is construed as narrow in scope intentionally. It's not a safety, this ordinance is not a safety standard. It's not a standard. They would like you to believe that this is an ordinance that says the amount of oil that can travel in this pipeline is zero and therefore it's a standard. It's not what it says. It says you can't build something or use something in this area of the city. In any event, what is still permitted is the offloading of oil, the historical use, not the new use of loading. So they can continue to bring in oil from the Middle East or Canada or wherever and put it in the pipeline and send it to Montreal. Now I understand there's little market demand for that, but that's not the city's fault. And it's not the result of the ordinance. And I urge the Court to look at what this Court said in Philip Morris v. Harshbarger, and that is when you're looking at preemption, you don't look at the intent of the people passing the ordinance, Congress or the city. You look at the intent of Congress when they passed what they intended to cover. The argument of Portland Pipeline would actually prove a little too much because their argument would create a nationwide exemption from zoning for any new construction necessary to transfer the contents of a pipeline anywhere, even in residential areas in the city. If the city of South Portland or the city of Boston said, hey, someone's planning on putting a pipeline or a tank, because a tank's in the transmission process or part of the Pipeline Safety Act, next to a school, we don't want that there because we think it might blow up and kill the children. So we're going to zone this area not to allow tanks. Cities and towns can do that. The rule that Portland Pipeline advocates wouldn't allow it. If I could turn briefly to the Foreign Affairs. At some point there was an agreement with the company and with South Portland to allow the installation of these pipelines through their territory. It was an agreement. The city did issue perhaps a permit or an approval when Portland Pipeline applied for that. And that was before the ordinance was amended. That was really what drove the passage of the ordinance, was that's what triggered people to look into this. But that permit was relinquished. It was voluntarily given or expired by its terms. It was extended by a year, and then it expired. And so then the city started looking at, hey, you know, the way things are written, this is probably allowed. Do we want this? And they determined they did not. So there was no grandfathering that said that once the permit had been granted, that there would be perpetual allowance to use the pipeline? No, that's correct, because the permit that was applied for, Portland Pipeline asked for an extension of time as they were out trying to solicit interest to market the product, and they weren't finding sufficient interest. So they asked the city for a little more time before it would expire, and the city extended that another year, and then it expired by its terms. And then Portland Pipeline voluntarily gave up all of its other permits through the other cities and towns and that they had done with that earlier 2008 to 2009 project. So there was an issue about grandfathering because that permit had expired. And then a new ordinance was passed to deal with the issue on a larger scale. If I could turn to Foreign Affairs, because the Pipeline Safety Act doesn't apply, we're left with Foreign Affairs and the Commerce Clause. And when I said before that no statute, regulation, executive order says you can't do this, it applies to the Foreign Affairs as well. The legal standard for the Foreign Affairs preemption is the same as the one voice test of the Commerce Clause. The judge, Portland Pipeline, and the City of South Portland all agree that. There's some murky area in the law about whether there are any differences, but we all agree for this case. It's really the same standard. And the standard is there must be a likelihood that the challenged state legislation will produce something more than an incidental effect in conflict with express foreign policy of the federal government, and there must be a clear conflict with a federal foreign policy expressed unmistakably in executive agreements signed by the president and consistently supported in the highest levels of the executive branch, and that's the Garamondi decision. And that is balanced against the importance of the local interest, balanced the federal interest against the local interest, but no one can dispute the judge's conclusion here that the core police power of restricting new uses in zoning districts and prohibiting new restrictions associated with those uses is historically important. So in that circumstance, a much more serious conflict between the clearly expressed foreign policy and the ordinance is necessary in order to overturn the ordinance. There isn't such a conflict. The ordinance is 100% consistent with direct and consistent text of federal foreign policy regarding the Portland Pipeline Company's pipeline. Now, let me just point out that this case is about four, a little over four years old. The summary judgment decision was issued a year and a half ago, and the United States government is nowhere in this courtroom. They have not intervened. They have not filed an amicus brief. They have not expressed in any forum here any objection to what this ordinance has done. Now, the clear statement of the federal government is that oil transportation, unlike, as I said before, nuclear power, natural gas pipelines, certain electricity transmission lines, oil transportation must comply with local zoning requirements. That's the law of the land. That's the policy of the federal government. The presidential permit issued to Portland Pipeline Corporation to operate the pipeline we're talking about here requires Portland Pipeline to, quote, comply with all applicable federal and state laws and regulations and obtain requisite permits from Canadian authorities as well as the relevant state and local government entities and relevant agencies. And the district court found that that expressed the clear intent of the government that the federal regulations is an additional requirement to the state regulation and the local regulation. They were meant to coexist. Now, if that's not enough, the transit pipeline agreement. Now, there was a count in this case involving the transit pipeline agreement. Portland Pipeline did not appeal the summary judgment in favor of the city, but it is relevant because it's an agreement between Canada and the U.S. It was a treaty. It was ratified by the Senate and signed by the president. And it is a treaty that I think doesn't specifically apply to this issue here, but it's relevant because even that has a savings clause. That has a savings clause that says the pipelines will be subject to regulations by local authorities in various areas, including environmental protection. So there is no specific and consistent statement of the federal government to rebut this. There are general statements about how important oil is to the national interest and inconsistent statements about cross-border pipelines depending upon who sits in the White House. President Obama said certain things, or his State Department said certain things about the Keystone Pipeline and rejecting it. And then the Trump Administration State Department said different things about the Keystone Pipeline when approving it. But whatever you take from that, it's not a clear and consistent statement of the federal government. And I would say there is no national uniformity necessary or intended for this kind of regulation. For example, Portland and Cape Elizabeth, Maine, prohibit all oil operations. Not just pipelines. All oil operations. That's why I stress we're South Portland, not Portland. We see it across the Bay. But Portland prohibits all oil operations. So does Cape Elizabeth, Maine. And the judge found this in his decision. Likewise, you can't have oil facilities in Marblehead Harbor or on Nantasket Beach. The argument PPLC is advocating leads to a conclusion that anyone who wants to put an oil terminal anywhere on the shore could do so because it's important that we export oil and we can use this to export oil. Or it's important that we import oil. Uniformity is not required, nor is it expected. And the clear policy of the federal government is that local regulation like this ordinance can apply. I will say briefly, this ordinance, the judge found it doesn't target Canada. It doesn't target any foreign nation. It applies equally to oil coming from British Columbia as well as Bismarck, North Dakota. It applies to oil going to Philadelphia as well as Paris. It doesn't matter. If you're bulk loading crude oil, you can't do it in the city of South Portland. Now, briefly under the Commerce Clause. The ordinance will be upheld unless the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits. That's the standard that's been repeated a million times by the case law. Cases kind of get a little confused about what standards you're supposed to apply where. But this court heard evidence of benefits, and I recited them earlier. He talked about the prevention of adverse health effects, hospital visits, cancer, premature deaths, interference with redevelopment goals. The redevelopment goals, as with the health benefits, he said none of that was speculative. None of that was a pretext for something else they want to do. It's what they genuinely wanted to protect. And the only evidence the court heard on the burden on commerce was that the primary burden fell on main companies, which doesn't apply for an interstate commerce clause, dormant commerce clause analysis. And then he heard speculation that the oil industry would be harmed if every coastal community enacted this ordinance. There was no evidence that others were actually considering it. In fact, there was testimony that coastal oil facility construction is increasing and has increased since the ordinance was passed. I see my time is up, and I urge the court to affirm the trial court's decision. Thank you, counsel. Thank you, Your Honor. First, on the issue of where is the government. The leading case in this circuit on the foreign affairs doctrine and the foreign commerce clause is Natsios, and the government was not there either. But if this court would like to ask the government what its position is on these issues, we would welcome the court. Without confusion, without the government coming. Well, and one statement my colleague said was sometimes an administration decides that foreign policy means we should encourage certain relations with pipelines, and sometimes another administration has a different balancing. Well, the point is it's the administration, it's the executive that makes this balancing. When President Obama decided the initial Keystone decision, he said, Canada has said this is going to hurt Canadian-U.S. relations. But I find, as the president, and looking at foreign policy interests overall, that I have weighed it in this way. And to shut down an existing pipeline without understanding this balancing that the president undertakes and interfering with that rises to the level that is undermined by a harbor city that denies any operation of an existing pipeline. And it's not speculative to say if it's enacted somewhere else. I thought they were only zoning to prevent a new use, not an old use. No, well, it's been reversed before. So a reversal of the pipeline is an old use, too. It makes absolutely, it runs through the pipeline in one direction. It was switched and then it was switched back. It's not a new use. But the important thing is it's for the president to decide whether the oil should flow across the border. And to say that. The president's not here. Well, we believe that the president has presidentially permitted this and has stated in presidential permitting decisions that what it wants to do is encourage cross-border transmission of oil. But we cannot say that this is a speculative item to say whether it will happen anywhere else. Because what this court is deciding today is whether not just this town can do this, but whether any town, any harbor city can shut down all maritime transportation in crude oil. Thank you. Thank you.